IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                  :
JUAN M. VAZQUEZ,                  :      HON. JEROME B. SIMANDLE
                                  :
            Plaintiff,            :      Civil No. 03-5596 (JBS)
                                  :
      v.                          :
                                  :           **OPINION**
DEVON BROWN, et al.,              :
                                  :
            Defendants.           :
                                  :
```

APPEARANCES:

Mr. Juan M. Vazquez
125080/758487B
Southern State Correctional Facility
P.O. Box 150
Delmont, NJ 08314
      Plaintiff pro se

Keith S. Massey, Jr., Deputy Attorney General
Office of the New Jersey Attorney General
Dept. of Law & Public Safety – Division of Law
25 Market Street
P.O. Box 112
Trenton, NJ 08625
      Attorney for Defendants

**SIMANDLE**, District Judge:

Plaintiff Juan M. Vazquez, who is presently confined at Southern State Correctional Facility ("SSCF") and is proceeding pro se, filed this action on November 26, 2003 pursuant to 42 U.S.C. § 1983, alleging that a long and evolving list of Defendants violated his constitutional rights. Plaintiff's prolix pleadings contain a litany of allegations, including claims that various Defendants confiscated his legal and religious materials; filed false disciplinary reports against

him; used excessive force upon him; and transferred him from one prison to another against his wishes.

Presently before the Court are Plaintiff's motion for a temporary restraining order and/or a preliminary injunction [Docket Item 74]; his motion for reconsideration of the Court's March 18, 2008 Opinion [Docket Item 75]; his motion for default judgment [Docket Item 76]; and his motion to strike pleadings [Docket Item 88].[1]  For the reasons explained below, the Court will deny Plaintiff's motions.

I.    **BACKGROUND**

A.    **Allegations in the Complaint**

Plaintiff's extensive allegations were set forth in detail in the Court's March 18, 2008 Opinion, and are summarized herein only to the extent necessary to address the motions presently under consideration.  Plaintiff is an inmate in the custody of the New Jersey Department of Corrections ("NJDOC") who is presently confined at SSCF.  Mr. Vazquez is a practitioner of

_____

[1]  Plaintiff also filed a supplemental certification in support of his motion for injunctive relief, which he has characterized as a motion "to supplement motions for Temporary Restraining Order and/or Preliminary Injunction" [Docket Item 81].  The Court accounts herein for the contents of Plaintiff's supplemental pleading; his motion to supplement is accordingly granted, although the motion for preliminary injunctive relief is denied.

Plaintiff also recently filed a "motion for Joinder of claims and persons" [Docket Item 89] to which opposition has not yet been filed and which the Court does not address in this Opinion.

Santeria.[2]  (Vazquez Cert., Mar. 24, 2008 at ¶ 2.)

Plaintiff was confined at the Garden State Youth Correctional Facility ("GSYCF") from November 28, 1999 through January 10, 2002.  (Docket Item 34 at 5.)  In 1999, during his incarceration at GSYCF, Plaintiff filed a separate civil rights complaint alleging that he had been denied access to certain religious articles in violation of his First Amendment rights. See Vazquez v. Burns, D.N.J. Civil Action No. 99-2589 (GEB). According to the Complaint in this action, while Vazquez v. Burns was pending, Defendant Brian Bonomo, an employee of GSYCF, filed false disciplinary reports against Plaintiff and threatened Plaintiff's life, acts which Plaintiff alleges were committed against Plaintiff in retaliation for pursuing his claims in Vazquez v. Burns.[3]  (Compl., Parties Section, ¶ 6.)

Plaintiff was transferred from GSYCF to the Administrative Close Segregation Unit ("ACSU") at East Jersey State Prison

_____

[2]  Santeria is a religion that stems from the "syncretion, or fusion" of western African and Cuban religious traditions. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 524 (1993).  It has been recognized as a religion entitled to First Amendment protection.  Id. at 531.

[3]  In Vazquez v. Burns, the court ultimately granted the defendants' motion for summary judgment, a decision which was affirmed on appeal.  (Civ. No. 99-2589 (GEB), Docket Item 64.) Significantly, as is explained in detail, infra, the Court of Appeals held that the NJDOC's decision to deny Plaintiff's access to a ceremonial beaded necklace did not violate Plaintiff's First Amendment rights because the decision was "reasonably related to legitimate penological interests."  (Id.) (quoting O'Lone v. Shabazz, 482 U.S. 342, 349 (1987)).

("EJSP") on January 10, 2002, where he was confined until
November 6, 2002.  (Docket Item 34 at 5-6.)  Plaintiff alleges
that after he was transferred, Defendants Michael Powers, C.
Offei, and T.V. Davis – all of whom are employed by EJSP –
unconstitutionally deprived Plaintiff of unspecified religious
articles and legal materials.  (Compl., Parties Section, ¶¶ 9-
11.)

On November 6, 2002, Plaintiff was transferred from EJSP to
Bayside State Prison ("BSP"), where he was confined until May 7,
2003.  (Docket Item 34 at 6.)  According to Plaintiff, after he
was transferred to BSP, Defendant Rina Terry unconstitutionally
deprived him of a religious book.  (Compl., Statement of Claims,
¶ 52.)  Plaintiff further claims that while he was incarcerated
at BSP, he submitted request forms on April 2, 2003 and April 14,
2003, for use of the law library and legal materials, but that
his requests were denied.  (Id. at ¶ 56.)  Two days later,
according to Plaintiff, on April 16, 2003, Plaintiff was brought
to "central control," where Defendant Georgescu yelled at
Plaintiff, threatened him with disciplinary action, and ordered
him never to enter the prison chapel or law library again.  (Id.
at ¶ 58.)  Plaintiff alleges that Defendant Georgescu also wished
Plaintiff a "happy Easter" in order to mock Plaintiff's religious
beliefs, and indicated that if Plaintiff spoke about these

matters he would be killed.[4]  (Id. at ¶¶ 58-60.)

Plaintiff was transferred from BSP to the ACSU at New Jersey State Prison ("NJSP") on May 7, 2003.  (Docket Item 34 at 7.) Plaintiff alleges that on May 8, 2003, he submitted an Inmate Request Form to Defendant Atchison concerning unspecified religious practices and articles but received no response. (Compl., Statement of Claims, ¶ 80.)  Plaintiff claims that he made a similar request for legal supplies, to which he likewise received no response.  (Id. at ¶ 86.)  He filed a Complaint in this matter on November 26, 2003 to seek redress for this series of alleged civil rights violations.[5]

### B.  Dismissal and Appeals

Defendants moved to dismiss Plaintiff's claims, arguing that as to the majority of his claims, Plaintiff had not exhausted his administrative remedies as the Prison Litigation Reform Act ("PLRA") requires of all "action[s] . . . brought [by prisoners] with respect to prison conditions under section 1983 of this title, or any other Federal law . . ."  42 U.S.C. § 1997e(a).  In its December 17, 2004 Opinion and Order, the Court agreed with

---

[4]  Plaintiff also claims that he was assaulted by Defendant Georgescu, as well as Defendants Caldwell, Cotto, and Bailey, on multiple occasions.  (Compl., Statement of Claims, ¶¶ 68-70.)

[5]  In November 2004, Plaintiff was transferred to South Woods State Prison ("SWSP"), where he was confined until May 2007.  In May 2007, Plaintiff was transferred to Riverfront State Prison ("RSP"), and in April 2008, he was transferred to SSCF, where he is presently confined.  (Albino Decl. Ex. A.)

Defendants that Plaintiff had failed to exhaust available
administrative remedies as to the majority of his claims.
(Docket Item 34 at 17.)  The Court further noted that courts in
this district and "in other jurisdictions confronted with
complaints involving both exhausted and unexhausted claims have
held that the entire case should be dismissed."  (Id. at 11-12)
(citing Rivera v. Whitman, 161 F. Supp. 2d 337, 341 (D.N.J.
2001), rev'd on other grounds, Ray v. Kertes, 285 F. 3d 287, 293
n.6 (3d Cir. 2002); Keenan v. Twommey, 229 F.3d 1152 (6th Cir.
2000); Graves v. Norris, 218 F.3d 884 (8th Cir. 2000)).  Based on
this authority, the Court dismissed the action without prejudice
to give Mr. Vazquez the opportunity to administratively grieve
his unexhausted claims, or to abandon his unexhausted claims and
proceed only with the exhausted claims.

Plaintiff appealed this Court's decision, which was affirmed
by the Court of Appeals on August 4, 2005.  (Docket Item 58.)
Plaintiff then filed a petition for a writ of certiorari with the
Supreme Court.  On January 22, 2007, the Supreme Court issued its
opinion in Jones v. Bock, 549 U.S. 199 (2007), which granted
Plaintiff's petition and vacated the order of the Court of
Appeals.  In Jones, the Supreme Court held that when faced with
prisoner complaints asserting exhausted and unexhausted claims, a
district court should proceed with the exhausted claims rather
than dismissing the entire action.  Id. at 223-24.

6

C.   **March 18, 2008 Opinion and Order**

Following the reinstatement of his exhausted claims, Plaintiff filed various motions seeking: (1) the recusal of the undersigned on account of alleged "personal, racial and/or religious beliefs" of the undersigned,[6] (Vazquez Cert., Aug, 27, 2007 at ¶ 39); (2) an order from the Court imposing sanctions on defense counsel pursuant to Rule 11, Fed. R. Civ. P., for alleged misconduct committed during this litigation, and holding various Defendants in contempt; and (3) a preliminary injunction enjoining Defendants from engaging in the allegedly unconstitutional conduct described in the Complaint.

In its March 18, 2008 Opinion and Order [Docket Items 72 and 73], the Court denied Plaintiff's motions seeking recusal, sanctions, and contempt orders, and dismissed without prejudice his motion for injunctive relief.  As the Court explains in greater detail below, it determined that Plaintiff's motions for recusal, sanctions, and contempt centered around his unfounded speculation into "the allegedly racist motives of the defendants and their attorneys" and the undersigned, found that these charges were without merit, and accordingly denied the motions. Vazquez, 2008 WL 746593, at *7.  With regard to Plaintiff's

---

[6] In particular, Plaintiff alleged that the undersigned "has shown his sympathies ('beliefs') lie with the racist ideology of the Ku Klux Klan's violent defense fund." (Vazquez Cert., Sept. 10, 2007 at ¶ 14.)

7

motion for a preliminary injunction, the Court found that
Plaintiff appeared to seek to enjoin allegedly unconstitutional
conduct at correctional institutions to which he was no longer
confined, and noted that Plaintiff lacked standing to pursue such
a claim.  Id. at *8.  Out of an abundance of caution in light of
Plaintiff's pro se status and his unspecific allusion to ongoing
violations, however, the Court dismissed the motion for
injunctive relief without prejudice to renewal upon a showing,
supported by competent evidence, that specific violations were
taking place at his present place of incarceration.  Id.

###     D.    Subsequent Motion Practice

After the Court issued its March 18, 2008 Opinion and Order,
Plaintiff filed the motions presently under consideration, as
well as numerous certifications and documents in support of his
request for injunctive relief.  Notwithstanding the Court's
determination that Plaintiff "clearly lacks standing to enjoin
allegedly unconstitutional acts taking place at the correctional
facilities where he is no longer incarcerated," id., and its
admonition that any certified statements submitted by Plaintiff
"should be based on his own personal knowledge, rather than
speculation and conclusory statements," id., Plaintiff's recent
certifications focus in large part on allegedly unconstitutional
conduct perpetrated at institutions where he is no longer

8

confined,[7] and are replete with unfounded speculative and

conclusory statements.[8]

---

[7] For instance, Plaintiff alleges that while he was
incarcerated at RSP, when he filed a complaint about fellow
inmates making excessive noise, a corrections officer let his
fellow inmates know that Plaintiff had filed the complaint, which
allegedly put Plaintiff in danger.  (Vazquez Cert., Mar. 24, 2008
at ¶ 25.)  Similarly, Plaintiff alleges that the Mental Health
Department at RSP administered antipsychotic medication to a
fellow inmate named Jason Beyer as a form of psychological
torture in furtherance of a "racial hate crime."  (Id. at ¶ 31;
Vazquez Cert., June 13, 2008 at ¶¶ 127-138.)  Plaintiff likewise
states that he experienced "racial violence" while confined at
SWSP, and that the prison inadequately investigated his
complaints of such violence.  (Vazquez Cert., Mar. 24, 2008 at ¶
34; Vazquez Cert., June 13, 2008 at ¶¶ 144-150.)  Plaintiff
further alleges that he was terminated from his position as head
cook for the officer's dining room at RSP because he became aware
of an inappropriate sexual relationship between his supervisor
and a fellow inmate, and that his administrative complaints about
the relationship went unanswered.  (Vazquez Cert., June 13, 2008
at ¶¶ 139-143.)  Additionally, Plaintiff's certifications devote
considerable attention to his concerns over the administrative
remedy processes at SWSP, RSP, and other institutions to which he
is no longer confined.  (Vazquez Cert., June 13, 2008 at ¶¶ 13-
69.)

In light of the Court's prior determination that Plaintiff
lacks standing to seek injunctive relief to prevent prison
officials from engaging in this allegedly unconstitutional
conduct at prisons to which Plaintiff is not confined and where
there is no indication that he will be confined in the future,
see Vazquez, 2008 WL 746593, at *8, the Court will deny
Plaintiff's claims seeking to enjoin conduct at GSYCF, EJSP, BSP,
NJSP, SWSP, and RSP.  Plaintiff may, of course, continue to seek
damages from the individual officers who allegedly violated his
constitutional rights, but he lacks standing to enjoin their
conduct in the future.

[8] For example, Plaintiff certifies that "the State of New
Jersey is providing material support and financial resources to
racial terrorists through its law enforcement agencies," a
conclusion he appears to draw from the fact that the housing
units at SWSP are "shaped in the form of K's[,] . . . [t]he
lamppost[s] are shaped in the form of Swastikas[,] . . . [and
t]he lampposts between the A and B building have six (6) lights

Scattered throughout Plaintiff's certifications, however, are a limited number of competent statements concerning alleged deprivations at SSCF, where Plaintiff is presently confined. First, Plaintiff alleges that he has experienced difficulty receiving certain ceremonial oils which he alleges are central to his religious practices.  (Vazquez Cert., June 13, 2008 at ¶ 8.) On July 14, 2008, Plaintiff submitted an "Inmate Remedy System Form" to SSCF's Religious Services Department requesting permission to order and possess six types of religious oils, which he stated were needed for ceremonial religious use. (Vazquez Cert., Sept. 15, 2008 Ex. B.)  In his request, Plaintiff stated that he

> expect[ed] to be able to purchase oils and retain them in [his] possession.  Other inmates[] in this institution[] purchase oils[] through the Ima[m] and retain them in their possession.  My request to purchase religious oils from source of sale should pose no security concerns for the administration.

---

in three different phases," (Vazquez Cert., June 13, 2008 at ¶¶ 182-184); as Mr. Vazquez explains, "[t]he number 666 is universally known as the 'Mark of the Beast.'"  (Docket Item 71 at ¶ 7(f).)  Plaintiff likewise speculates that "the NJDOC and NJSPB have employed and continue to employ psychologists to justify the use of torture on me and others in an anti-religious race-hate conspiracy."  (Vazquez Cert., June 13, 2008 at ¶ 138.) Plaintiff further speculates that defense counsel and NJDOC personnel are conspiring to subject him to violence.  (Id. at ¶¶ 209-212.)  Additionally, Plaintiff surmises that the failure of GSYCF administrators to investigate his administrative complaints resulted from the administrators' participation in "a drug smuggling heroin operation[] being coordinated by prison officials."  (Id. at ¶ 232.)  The Court does not, of course, credit these and similar baseless and speculative statements in considering the merits of Plaintiff's motions.

(Id.)  The Supervising Chaplain of SSCF, Imam Shakur, responded
to Plaintiff's request, stating "I find no problem in your
request as I have stated during the interview.  Place your
order/I'll approve."  (Id.)

Plaintiff placed an order for six types of religious oil,
but when the package containing his order arrived at SSCF's mail
room, he received a "notice of non-permitted item(s) being held,"
which stated that the oils were "not permitted" and had to be
mailed out by Plaintiff or they would be destroyed.  (Vazquez
Cert., Sept. 15, 2008 Ex. A.)  Plaintiff submitted an
administrative remedy form to Imam Shakur to address the withheld
oils, to which Imam Shakur responded

> I was told by you that the mail room denied them.  Upon
> my discussion and follow up with the mailroom sergeant,
> I was told that she would only [accept] products that
> came directly to me for distribution, I didn't know that
> info before.  We have new policies.  I'll interview you
> for a new order of oils.

(Docket Item 92 at 3.)  Plaintiff responded to Imam Shakur with
another administrative remedy form, in which he stated:

> As a Muslim, you do not provide Santeria artifacts, so I
> can not see how my products have to come from you.  If I
> do not receive the oils I purchased, I will have my
> relatives contract central office SID accusing you of
> religious extortion.  I refuse to allow you to
> financially extort me for my religious articles.

(Id.)  There is nothing in the record to suggest that Plaintiff
took Imam Shakur up on his offer to place a new order of oils to
be distributed to Plaintiff through the chaplain's office.

11

Additionally, Plaintiff alleges that SSCF has denied him permission to receive ceremonial beaded necklaces that have been "consecrated by an initiated [Santeria] priest," which Plaintiff asserts are necessary to the practice of his faith.  (Vazquez Cert., June 13, 2008 at ¶ 11.)  Plaintiff requested that Imam Shakur assist him in contacting a Santeria priest in order to obtain such consecrated necklaces, which Imam Shakur apparently denied.[9]  (Id.)

## II.  DISCUSSION

### A.  Motion for Reconsideration

The Court first addresses Plaintiff's motion for reconsideration of its March 18, 2008 Opinion, in which it denied Plaintiff's earlier motions seeking recusal, sanctions, and contempt orders.  Local Civil Rule 7.1(i) of the United States District Court, District of New Jersey, governs the Court's review of Plaintiff's motion for reconsideration.  Rule 7.1(i) requires the moving party to set forth the factual matters or controlling legal authorities it believes the court overlooked when rendering its initial decision.  L. Civ. R. 7.1(i).  Whether to grant a motion for reconsideration is a matter within the Court's discretion, but it should only be granted where such

---

[9]  Specifically, Plaintiff states that in denying his request for a consecrated necklace, Imam Shakur told Plaintiff that he did "not need a priest to practice the Santeria religion."  (Vazquez Cert., June 13, 2008 at ¶ 11.)

12

facts or legal authority were indeed presented but overlooked.

See DeLong v. Raymond Int'l Inc., 622 F.2d 1135, 1140 (3d Cir.

1980), overruled on other grounds by Croker v. Boeing Co., 662

F.2d 975 (3d Cir. 1981); Williams v. Sullivan, 818 F. Supp. 92,

93 (D.N.J. 1993).  To prevail on a motion for reconsideration,

the movant must show either

> (1) an intervening change in the controlling law; (2) the
> availability of new evidence that was not available when
> the court . . . [rendered the judgment in question]; or
> (3) the need to correct a clear error of law or fact or
> to prevent manifest injustice.

Max's Seafood Café ex rel. Lou-Ann, Inc., v. Quinteros, 176 F.3d

669, 677 (3d Cir. 1999).

Plaintiff focuses exclusively on Max's Seafood Café's third

criterion, arguing that the Court made legal and factual errors

in denying his motions for recusal, sanctions, and contempt.  For

the reasons set forth below, the Court finds that it made no such

error, and will deny Plaintiff's motion for reconsideration.

In denying Plaintiff's motion seeking the recusal of the

undersigned, the Court explained:

> Under 28 U.S.C. § 455(a), a judge of the United States
> must "disqualify himself in any proceeding in which his
> impartiality might reasonably be questioned."  Section
> 455(a) requires disqualification not only where actual
> partiality exists, but where the judge's consideration of
> the case risks creating the appearance of bias.  Liteky
> v. United States, 510 U.S. 540, 548 (1994) . . . . In
> determining whether a reasonable person would question
> the   impartiality   of   a   judge   under   particular
> circumstances, a distinction is drawn between alleged
> bias   resulting   from   "a   source   outside   judicial
> proceedings," on the one hand, and alleged bias stemming

from prior proceedings held before the judge in question. <u>Liteky</u>, 510 U.S. at 554. Under this "extrajudicial source" doctrine, if a party does not demonstrate that the judge's alleged bias stems from a source outside the judicial proceedings, he must bear the substantial burden of proving that "the Judge's opinions and remarks [] reveal a deep-seated or high degree of favoritism or antagonism that would make fair judgment impossible" in order to warrant disqualification. [<u>United States v. Wecht</u>, 484 F.3d 194, 213 (3d Cir. 2007)] (citing <u>Liteky</u>, 510 U.S. at 555-56) (internal quotations omitted); <u>see also</u> <u>LoCascio v. United States</u>, 473 F.3d 493, 495 (2d Cir. 2007) (stating that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion") (citation omitted).

<u>Vazquez</u>, 2008 WL 746593, at *4.

The Court found that Plaintiff's recusal motion focused exclusively on the Court's prior rulings as to the issue of administrative exhaustion, and explained that its "opinions and remarks . . . [did not] reveal a deep-seated or high degree of favoritism or antagonism that would make fair judgment impossible." <u>Wecht</u>, 484 F.3d at 213. The Court further noted that "[t]he soundness of the Court's determination that the summary judgment record did not contain evidence raising a question of fact as to whether Plaintiff pursued all available administrative remedies is further supported by the affirmance of this Court's decision by the Court of Appeals." <u>Vazquez</u>, 2008 WL 746593, at *5 n.9.

Plaintiff has not demonstrated that this Court's decision not to recuse itself from further consideration of this case was premised upon a legal or factual error. Plaintiff's motion for

14

reconsideration again targets the Court's prior legal rulings, arguing that the Court misapplied the law when granting Defendants' motion for summary judgment.  Specifically, Plaintiff asserts that the Court misapprehended the parties' respective burdens of proof on the question of exhaustion and thus erroneously granted Defendants' motion for summary judgment.  The fact that Plaintiff believes that the Court decided Defendants' motion for summary judgment incorrectly, however, is simply not relevant to the issue of whether or not the Court should have recused itself – the central premise of the extrajudicial source doctrine is that a litigant's mere dissatisfaction with a judge's rulings is not an appropriate reason for recusal, because "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion."  LoCascio, 473 F.3d at 495.

Plaintiff has identified no "opinions and remarks [] reveal[ing] a deep-seated or high degree of favoritism or antagonism that would make fair judgment impossible" that this Court overlooked when declining to recuse itself from this matter.[10]  Wecht, 484

---

[10]  Plaintiff likewise argues that the Court made a factual error when it overlooked Plaintiff's "request to take judicial notice" of certain facts, which is a document Plaintiff filed prior to the Court's denial of his motion for recusal.  The Court did not overlook this document, which urges the Court to take notice of such "facts" as "[t]he architectural structure of the housing units at South Woods (race-hate) State Prison (hereinafter SW(rh)SP) are shaped in the form of K's when seen from an aerial view would seem to symbolize KKK across its geographical area."  (Docket Item 71 at 5.)  Such assertions have no bearing on the Court's decision not to recuse itself.

F.3d at 213.  His motion for reconsideration of the Court's

denial of his recusal motion will accordingly be denied.[11]

The Court likewise made no legal or factual error in denying

his motion for Rule 11 sanctions and to hold Defendants and

defense counsel in contempt.  In support of his motion for

reconsideration, Plaintiff simply rehashes his argument, rejected

in the Court's March 18, 2008 Opinion, that defense counsel

should have been sanctioned for arguing that Plaintiff's failure

to exhaust all of his claims warranted the dismissal of his

lawsuit under the "total exhaustion" rule adopted by many courts

prior to the Supreme Court's decision in <u>Jones v. Bock</u>.  As the

Court explained in its March 18 Opinion,

> [t]he arguments advanced by Defendants in support of
> their motion for summary judgment do not come close to
> approximating the patently unmeritorious or frivolous
> category of motions for which Rule 11 sanctions are
> reserved.   Plaintiff  appears  to  argue  that  the
> frivolousness of Defendants' argument is evidenced by
> Supreme Court's subsequent holding that the PLRA does not
> contain  a  total  exhaustion  requirement.    But  the
> frivolousness of an argument is not judged retroactively
> after that argument has not prevailed, but rather, by the
> state of the law at the time the argument was advanced.
> Far from being patently frivolous at the time Defendants
> submitted their motion, the argument that the PLRA's
> exhaustion  rule  required  prisoners  to  exhaust
> administrative remedies for all of their claims before
> filing suit had been accepted by courts in this district,
> <u>see</u>, <u>e.g.</u>, <u>Rivera</u>, 161 F. Supp. 2d at 341, and multiple
> courts of appeals, <u>Keenan</u>, 229 F.3d at 1152; <u>Graves</u>, 218
> F.3d at 884, before Defendants filed their motion.

---

[11]  If Plaintiff believes that this Court has decided
matters in this case incorrectly, he, like any litigant, may file
an appropriate appeal from an appealable order.

<u>Vazquez</u>, 2008 WL 746593, at *6 (some citations and footnote omitted).  This decision not to impose sanctions on defense counsel pursuant to Rule 11 was not in error, and Plaintiff's motion for reconsideration will be denied.

Finally, Plaintiff urges the Court to reconsider its decision not to hold certain Defendants and defense counsel in contempt of an order entered by Chief Judge Brown in <u>Vazquez v. Burns</u>, D.N.J. Civil Action No. 99-2589 (GEB).  This Court does not have the authority to hold a party in contempt of Chief Judge Brown's orders, because "[c]ontempt proceedings, whether civil or criminal, must be brought in the court that was allegedly defied by a contumacious act."  Fed. R. Civ. P. 4.1, Notes of Advisory Committee; <u>see</u> <u>also</u> <u>International Union, UMWA v. Bagwell</u>, 512 U.S. 821, 829 (1994) ("civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct"); <u>L.J. ex rel. V.J. v. Audubon Bd. of Educ.</u>, No. 06-5350, 2007 WL 3252240, at *10 (D.N.J. Nov. 5, 2007) (citing cases).  The Court thus did not err in denying Plaintiff's motion for contempt.  Plaintiff's motion for reconsideration will accordingly be denied.

### B.  Motions for Default Judgment and to Strike Pleadings

The Court will also deny Plaintiff's motions for default judgment and to strike Defendants' pleadings [Docket Item 76 and 88].  Plaintiff appears to believe that he is entitled to default

judgment because Defendants failed to file a response to a document he filed in January 2008 entitled "request to take judicial notice."[12]  Because Defendants have not "failed to plead or otherwise defend" in this action, Plaintiff is not entitled to default judgment, and his motion will be denied.  Fed. R. Civ. P. 55(a).

Plaintiff's motion to strike pleadings is similarly baseless.  In support of this motion, Plaintiff submits a certification in which he opines that Defendants' response to his pleading should be stricken because it is "redundant, [] immaterial, and [] has an insufficient defense."  (Vazquez Cert., Sept. 15, 2008 at ¶ 2.)  While the Court does not agree with Plaintiff's characterization of Defendants' pleading, this is beside the point: a litigant's disagreement with the arguments advanced by his adversaries affords no basis to "strike" the adversaries' pleading.  Plaintiff's motion is frivolous and will be denied.

## C.  Motion for Preliminary Injunctive Relief

As the Court explained, <u>supra</u>, Plaintiff's motion for preliminary injunctive relief, and the certifications submitted in support thereof, largely target allegedly unconstitutional

---

[12]  As the Court recognized in Note 10, <u>supra</u>, this document consists primarily of baseless, irrelevant, or conclusory statements suggesting that the NJDOC is engaged in a racist conspiracy.

actions taken at penal institutions to which he is no longer
confined and at which there is no suggestion that he will be
confined in the future,[13] which the Court has already determined
that Plaintiff lacks standing to pursue.[14]  See Vazquez, 2008 WL
746593, at *8.  However, Plaintiff has also alleged that his
First Amendment right to the free exercise of religion is
presently being violated as a result of the alleged deprivation
of two categories of religious articles, which Plaintiff asserts
are necessary to his religious practices: six bottles of
religious oils and a consecrated beaded necklace.  The Court sets
forth the standard governing its review of Plaintiff's claim for
injunctive relief arising from these alleged deprivations and
addresses the merits of Plaintiff's motion in turn below.

  1. Preliminary Injunction Standard

  In order to obtain a preliminary injunction, the moving
party must establish that "(1) it has a likelihood of success on
the merits, (2) it will suffer irreparable harm if the injunction
is denied, (3) granting preliminary relief will not result in
even greater harm to the nonmoving party, and (4) the public

   [13] See Notes 7 and 8, supra.

   [14] As the Court noted in Note 7, supra, although Plaintiff
no longer has a cognizable interest in enjoining allegedly
unconstitutional conduct at institutions where he is no longer
confined and where there is no suggestion that he will be
confined in the future, Plaintiff may continue to pursue his
claims for monetary damages against the individual Defendants who
allegedly violated his rights.

19

interest favors such relief." Rogers v. Corbett, 468 F.3d 188, 192 (3d Cir. 2006) (internal quotations and citations omitted). The Court of Appeals has noted that "[p]reliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (internal quotations and citations omitted).  The PLRA provides additional guidance to courts asked to issue a preliminary injunction with respect to prison conditions:

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.

18 U.S.C. § 3626(a)(2).[15]

---

[15]  Section 3626(a)(1)(B), in turn, provides:

The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless--

(i) Federal law requires such relief to be ordered in violation of State or local law;

(ii) the relief is necessary to correct the violation of a Federal right; and

2.   <u>Likelihood of Success on the Merits</u>

The law applicable to prisoners' free exercise claims is well-settled.  Although prisoners "clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion," <u>O'Lone v. Shabazz</u>, 482 U.S. 342, 348 (1987) (citations omitted), at the same time, "the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." <u>DeHart v. Horn</u>, 227 F.3d 47, 50-51 (3d Cir. 2000) (en banc) (citing <u>Pell v. Procunier</u>, 417 U.S. 817, 822-23 (1974)).

To ensure that the proper balance between a prisoner's constitutional rights and these penological objectives is maintained, the Court engages in a two-step analysis.  First,

> two threshold requirements must be met before particular beliefs, alleged to be religious in nature, are accorded first amendment protection.  A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things.   If either of these two requirements is not satisfied, the court need not reach the question, often quite difficult in the penological setting, whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claim.

<u>Id.</u> at 51-52 (citations omitted).  If the plaintiff establishes

---

(iii) no other relief will correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(B).

21

that his beliefs are sincerely held and religious in nature, then
the Court balances four factors set forth by the Supreme Court in
Turner v. Safley, 482 U.S. 78, 89-91 (1987):

> first, whether the regulation bears a "valid, rational
> connection" to a legitimate and neutral governmental
> objective; second, whether prisoners have alternative
> ways of exercising the circumscribed right; third,
> whether accommodating the right would have a deleterious
> impact on other inmates, guards, and the allocation of
> prison resources generally; and fourth, whether
> alternatives exist that "fully accommodate[ ] the
> prisoner's rights at de minimis cost to valid penological
> interests."

Fraise v. Terhune, 283 F.3d 506, 513-14 (3d Cir. 2002) (quoting
Turner, 482 U.S. at 89).

### a.   Religious Oils

Turning to Plaintiff's claim that the prison's interference
with his access to six bottles of religious oils violated his
First Amendment rights, the Court finds that Plaintiff is not
likely to succeed on the merits of his claim.  As Plaintiff's
submissions in support of this claim make clear, the prison
officials at SSCF have not withheld permission from Plaintiff to
possess in his cell precisely the same religious oils underlying
this claim – in response to Plaintiff's request that he be
permitted "to purchase oils and retain them in [his] possession,"
Imam Shakur stated, "I find no problem in your request as I have
stated during the interview.  Place your order/I'll approve."
(Vazquez Cert., Sept. 15, 2008 Ex. B.)  Instead, Plaintiff's
claim appears to assert a First Amendment right to have the oils

sent to him directly, rather than having them mailed to the
prison's chaplain for distribution; Plaintiff's reply to Imam
Shakur's statement that the oils would have to be mailed to the
chaplain's office was that "[a]s a Muslim, you do not provide
Santeria artifacts, so I can not see how my products have to come
from you."  (Docket Item 92 at 3.)

Under the first step of its free exercise inquiry, while the
Court has no reason to doubt the sincerity of Plaintiff's
religious beliefs as a general matter, it would be hard-pressed
to find that Plaintiff has a "sincerely held . . . religious"
belief that his religious oils must be mailed to him directly
rather than being mailed to the prison chaplain for subsequent
distribution.  DeHart, 227 F.3d at 51-52.  In other words,
Plaintiff's request to obtain and possess religious oils was not
denied, but, instead, was granted subject to the most negligible
of caveats that they be sent to Imam Shakur before being
distributed to Plaintiff.  There is nothing in the record from
which the Court could conclude that Plaintiff's desire to receive
his religious oils by direct mail, rather than through the
chaplain's office, is fueled by a sincerely held religious
belief, rather than a simple personal preference.  Id.

Even if the Court were to conclude that Plaintiff's
preference for direct mailing is motivated by a sincerely held
religious belief, however, the requirement that the religious

23

oils be mailed to the prison chaplain before being distributed to Plaintiff easily passes muster under the Turner factors.  First, the requirement manifestly "bears a valid, rational connection to a legitimate and neutral governmental objective."  Fraise, 283 F.3d at 513-14 (citation omitted).  Requiring that religious articles be sent to the prison's chaplain is an utterly sensible security measure that serves the NJDOC's compelling interest in regulating and controlling the items sent to inmates in its custody.  Second, in light of the exceedingly minimal inconvenience to Mr. Vazquez's religious practices that the policy imposes, Mr. Vazquez inarguably has "alternative means of exercising his [Santeria] . . . beliefs generally."  DeHart, 227 F.3d at 54.  That is, Plaintiff can engage in precisely the same religious practices with the oils that he would be able to perform if the policy were not in place, subject to the marginal inconvenience of having to retrieve his orders from an intermediary in the chaplain's office.  Third, the Court finds that permitting Plaintiff to receive religious articles through the mail directly "would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally."  Fraise, 283 F.3d at 513-14.  If Plaintiff were permitted to receive religious articles in the mail directly, other inmates would doubtless seek to avail themselves of the same privilege, which would undermine the compelling

24

institutional security interest previously recognized.[16]
Finally, there are no "alternatives . . . that fully accommodate[
] the prisoner's rights at de minimis cost to valid penological
interests," id. (internal quotations and citations omitted),
because the existing policy does fully accommodate Plaintiff's
rights – SSCF permits him to obtain his religious oils and
possess them in his cell, and merely requires that he place and
retrieve his requests from the chaplain's office.

In summary, the Court finds that Plaintiff is unlikely to
prevail on the merits of proving that SSCF's policy of requiring
that orders for religious articles be mailed to the chaplain's
office violates his First Amendment rights.

b.   Beaded Necklaces

Plaintiff also asserts a free exercise claim based upon Imam
Shakur's refusal to grant him permission to receive beaded
necklaces consecrated by a Santeria priest.  Plaintiff asserted
an identical claim in Vazquez v. Burns, which was rejected by the
district court and upheld on appeal.  (Civ. No. 99-2589 (GEB),

---

[16]  The policy is also a rational allocation of prison
resources, since the chaplain's office is better suited than the
mail room to determine whether the chaplain has granted an inmate
permission to receive specific religious articles.  See Fraise,
283 F.3d at 513-14.  Indeed, the confusion that arose in Mr.
Vazquez's case – with Imam Shakur granting permission to receive
religious oils and the mail room staff detaining the oils once
they arrived – evidences the logic of the policy of requiring
that such articles be mailed to, and distributed through, the
chaplain's office.

Docket Item 64.)  While Defendants have not argued that Plaintiff

is collaterally estopped from relitigating this claim,[17] the

Court of Appeals' rejection of Plaintiff's free exercise claim

arising out of his request to possess beaded necklaces

demonstrates forcefully why he is unlikely to prevail on an

identical claim in this action:

> New Jersey Department of Corrections regulations prohibit
> the "possession, receipt or exhibition of anything
> related to a security threat group such as . . .
> medallions [and] beads . . ." N.J.A.C. § 10A:5-6.2(c).
> This regulation satisfies the first factor of the
> Turner analysis.  The prohibition is neutral and bears a
> rational connection to the legitimate penological
> interest in maintaining order and security.  Fraise v.
> Terhune, 283 F.3d 506, 516 (3d Cir. 2002).  In
> considering the second factor, the question is whether
> the inmate has, in general, an alternative means to
> exercise his religion, not whether the inmate has
> alternative means [of] engaging in a particular practice.
> Id. at 518.  Here, there is no evidence that Vazquez was
> unable to practice his faith; particularly in light of
> the various other religious articles he was ultimately
> allowed to possess.  As to the third factor, allowing
> Vazquez to have the multi-colored beaded necklace could
> result in other inmates claiming a First Amendment right
> to possess items otherwise identified as [security threat
> group]-related.  With the potential for such a
> "significant 'ripple effect,' courts should be
> particularly deferential to the informed decisions of
> correction officials." Turner, 482 U.S. at 90.  Lastly,
> . . . . [as to the fourth factor, the prison] conceivably
> could have only restricted Vazquez's possession of the
> particular necklace in his cell, while permitting him to
> use it within the confines of the prison chapel.  Such an
> accommodation may have had only a de minimis [effect] on

---

[17]  See Peloro v. United States, 488 F.3d 163, 174-75 (3d
Cir. 2007) (explaining doctrine of non-mutual issue preclusion);
Blonder-Tongue v. University Foundation, 402 U.S. 313, 350 (1971)
(noting that "(r)es judicata and collateral estoppel are
affirmative defenses that must be pleaded").

[the prison]'s security interest.

> In sum, we find that the first three <u>Turner</u> factors weigh
> in favor of the prison regulation, while the fourth
> factor arguably weighs in favor of Vazquez.  Viewing all
> the factors collectively, we conclude that the
> restriction on [security threat group]-related material
> did not violate Vazquez's First Amendment rights.

(Civ. No. 99-2589 (GEB), Docket Item 64 at 14-16) (some citations
omitted).

Given that Plaintiff has previously asserted an identical
claim arising out of the rejection of his request to possess
ceremonial beaded necklaces, and that the Court of Appeals upheld
the entry of summary judgment on that claim in unmistakable
terms, the Court concludes that Plaintiff is unlikely to prevail
on the merits of his free exercise claim in this case.

    3.  <u>Remaining Preliminary Injunction Considerations</u>

The remaining preliminary injunction factors likewise do not
indicate that an injunction should issue here.  While, as a
general proposition, "the violation of one's right to the free
exercise of religion necessarily constitutes irreparable harm," <u>O
Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389
F.3d 973, 1008 (10th Cir. 2004), where a plaintiff has failed to
demonstrate a probability of success on the merits, the mere
invocation of a right to free exercise will not satisfy a
movant's burden of establishing that he is entitled to the
"extraordinary remedy" of injunctive relief.  <u>Kos
Pharmaceuticals</u>, 369 F.3d at 708.  Moreover, in light of the

27

PLRA's prescription that injunctive relief in the context of prison conditions must "extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm," the Court finds that the balance of hardships in this case tips decisively in Defendants' favor.  18 U.S.C. § 3626(a)(2). Finally, "[t]he public interest weighs in favor of policies which encourage security in prisons," Nicholas v. Ozmint, No. 8:05-3472, 2006 WL 2711852, at *5 (D.S.C. Sept. 20, 2006), where, as here, such policies do not impinge upon inmates' constitutional rights.

Balancing these considerations, the Court concludes that Plaintiff is not entitled to the injunctive relief he seeks.  His motion for a preliminary injunction will accordingly be denied.

### III. CONCLUSION

For the reasons explained above, the Court will grant Plaintiff's motion to supplement his pleadings but deny the remainder of the relief he seeks.  The accompanying Order will be entered.


**October 30, 2008**                         **_s/ Jerome B. Simandle_**
Date                                          JEROME B. SIMANDLE
                                              United States District Judge